**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| STANTON H. PEARSON | : | CASE NO. 05-50095-JBR |
| <u>DEBTOR</u> | : | |

**ORDER ON MOTION OF EUREKA BROADBAND CORPORATION TO DISMISS DEBTOR'S PETITION AND OBJECTION TO CONFIRMATION**

This matter came before the Court for an evidentiary hearing on the Motion of Eureka Broadband Corporation to Dismiss Debtor's Petition [#78], to which the Debtor objected [#98], and Eureka's Objection to Confirmation of Debtor's First Amended Chapter 13 Plan [#77].  The following constitute the Court's findings of fact and conclusions of law pursuant to Fed. Bankr. R. P. 7052.  It is hereby FOUND:

1.  That the facts as set forth in the "admitted facts" section of the Joint Pretrial Memorandum and the facts found by the United States District Court for the District of Massachusetts, <u>Eureka Broadband Corporation v. Wentworth Leasing Corp.</u>, 2004 U.S. Dist. LEXIS 2572 (D. Mass.), <u>aff'd</u>, 400 F.3d 62 (1st Cir. 2005), are incorporated herein by reference and establish that Wentworth Leasing Corp., as the equipment lessor, intentionally defrauded Eureka by, among other things, representing Wentworth had the ability to pay and would pay for the equipment to be leased by Eureka and by subsequently fraudulently diverting payments from Eureka's account debtors to Wentworth.[1]

---

[1] The district court's decision details the scheme by which "Pearson mailed some one hundred postcards [fraudulently embossed with Eureka's corporate logo] to customers on the list of accounts receivable that Eureka had provided him a part of its 'due diligence.'" The postcards misrepresented that Eureka's mailing address had changed and Eureka's account debtors were advised to send their payments to the post

2. The Debtor is and always has been the sole shareholder, sole director, and president of Wentworth and is responsible for Wentworth's actions. Indeed the District Court so found. District Court decision at n.12. ("While Pearson is not named individually in the lawsuit, there is no dispute that as Wentworth's President and sole shareholder, his actions were those of Wentworth.") Wentworth was founded in late 1997. It has not operated since 2001 or 2002. It has not filed any tax returns since 1998.

3. The District Court, after a bench trial, entered judgment in the amount of $216,020.84, ordered Wentworth to provide a full accounting of all payments made by Eureka's account debtors and received by Wentworth, and ordered the turnover of the payments made by Eureka's account debtors.

4. When Wentworth failed to comply with the District Court's order, the Court ordered the Debtor to personally guarantee that Wentworth pay Eureka the sum of the unlawfully diverted money. When the Debtor failed to comply, the district court threatened sanctions, including incarceration.[2]

5. The Debtor paid the amount of the diverted money ordered to be paid by the District Court with money borrowed from his current employer. No other portion of the judgment has been paid.

6. On or about April 21, 2005 the District Court granted Eureka a trustee process

---

office box controlled by the Debtor and Wentworth. Unfortunately at least one account debtor did. District court decision at ¶ 13.

[2]It appears that the contempt proceedings occurred while the district court's judgment was on appeal. There is no indication that the judgment was stayed pending the outcome of the appeal.

attachment on the Debtor's personal savings account, up to the amount of $250,000.

      7.  On or about July 1, 2005 the Debtor purchased his current residence for $460,000.  Title to the residence is in the Debtor's name only.  On September 12, 2005 the district court granted Eureka an attachment on the residence, up to an amount of $250,000.

      8.  On October 14, 2005 the Debtor filed a voluntary petition pursuant to Chapter 13 of the United States Bankruptcy Code.  In his original Schedule A, filed on December 12, 2005, the Debtor listed the residence as having a value of $435,000 while original Schedule D reflects that Countrywide Home Loans holds first and second mortgages on the residence in the amounts of $182,529.07 and $91,756.69, respectively.  The Debtor testified that he purchased the residence for $460,000 in June 2005 and that he borrowed $460,000 from Countrywide at that time.  Schedule D indicates the value of the residence is $435,000 and the total amount of the first mortgage is $367,529.07.  The Schedule also claims that $182,529.07 of the first mortgagee's claim is unsecured as is the entire $91,756.69 of the second mortgage.

      9.  The original Schedule B lists the Debtor's 100% ownership of Wentworth which he values as "unknown."  The original schedule B also reflects items of negligible value, including a helicopter, which the Debtor claims in "un-airworthy," and although title to the residence is solely in the Debtor's name, he claims all of the furnishings belong to his wife.

      10.  Some of the Debtor's scheduled claims include claims against Wentworth.  The schedules and Statement of Financial Affairs do not reflect that Wentworth has value in receivables owed to Wentworth as a result of lease residuals.  At trial, the

Debtor acknowledged that these receivables could range from $10,000 to several hundred thousand dollars, in the aggregate. The Debtor claims that he threw out all of the corporate records because he could not afford monthly storage charges of approximately $500. The Court is skeptical that the destruction of the corporate records was motivated by the Debtor's inability to pay for their storage. Moreover, a multi-page document of what purports to be a list of leases and their residual value, as well as contact information, was introduced at trial. The Debtor claims he found the list among some papers after his deposition but does not know who created the list. The Debtor has done nothing to collect the residuals even though the residual value of the leases, after payment of Wentworth's creditors, many of whom are also the Debtor's creditors, could increase the dividend to the Debtor's creditors.

      11. The Debtor's original Schedule I reflects a total monthly income of $8,595.29, including $1,311 in support payments paid to the Debtor's spouse. The Debtor lists his job as project manager for a local golf community. The original Schedule J lists $8,306.48 in expenses, including $1,600 a month for "Kids expenses- camp, b-days, x-mas, school activities, etc." The Debtor and his wife have four children, including the Debtor's three step-children. During the year prior to filing bankruptcy, the Debtor gave his step-son $3,000 to pay the step-son's bills.

      12. The Debtor scheduled unsecured claims in the amount of $73,529.87, not including the debt owed to Eureka (which was listed as an undersecured debt on Schedule D) and originally proposed to commit $289 a month for a period of 40 months yielding a dividend of 1.5% to his unsecured creditors, including Eureka. The IRS and Eureka objected to the plan and their objections were sustained.

13. On or about June 20, 2006, the Debtor filed amended schedules which, among other things, reduced the unsecured debt by $15,000 and cut the "Kids expenses" almost in half. Schedule I indicates that the Debtor is unemployed and received unemployment income of $651 per week. Amended Schedule I also indicated he "expects his new job as Project Manager will begin in the middle of July or sooner, in which he will again be making approximately $11,600 per month." At the same time the Debtor also filed the First Amended Plan in which he proposes to pay $509 a month for sixty months. Despite these changes, the First Amended Plan reflects that the dividend to unsecured creditors, including Eureka, will only increase to 1.6%.

14. 11 U.S.C. 1307(c) permits dismissal or conversion of a case under Chapter 13 "for cause." Although lack of good faith is not enumerated among the non-exhaustive list of circumstances constituting good faith, a lack of good faith, or bad faith, constitutes cause. In re Cabral, 285 B.R. 563, 572 (1st Cir. BAP 2002); In re Scotten, 147, 149 (Bankr. D. Mass. 2002). Good faith must exist at two different stages in a Chapter 13 case: first upon the filing of the petition, second upon the filing of the plan. Cabral, 285 B.R. at 572. Good faith, or the lack thereof, is determined by the totality of the circumstances. It involves an examination of a debtor's pre- and post-petition conduct. Scotten, 281 B.R. at 149.

15. In addressing what factors courts examine in determining whether a petition is filed in good faith, the Bankruptcy Appellate Panel stated

> In applying the totality of the circumstances test to determine whether a Chapter 13 *petition* has been filed in bad faith, bankruptcy courts generally consider the following factors: (1) whether the debtor misrepresented facts in her petition, unfairly manipulated the Bankruptcy Code, or otherwise filed

5

> her Chapter 13 petition in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor only intended to defeat state court litigation; and (4) whether egregious behavior is present. See Ho v. Dowell, 274 B.R. at 876 (citations omitted). A finding of bad faith does not require fraudulent intent by the debtor. Neither malice nor actual fraud is required to find a lack of good faith. The bankruptcy judge is not required to have evidence of debtor ill will directed at creditors, or that debtor was affirmatively attempting to violate the law--malfeasance is not a prerequisite to bad faith.

Cabral, 285 B.R. at 573 (internal citations omitted).

16. In addressing whether a plan is filed in good faith, the same court noted

> courts have articulated the following factors in analyzing whether a Chapter 13 plan has been filed in good faith: (1) the debtor's accuracy in stating her debts and expenses; (2) the debtor's honesty in the bankruptcy process, including whether she has attempted to mislead the court and whether she has made any misrepresentations; (3) whether the Bankruptcy Code is being unfairly manipulated; (4) the type of debt sought to be discharged; (5) whether the debt would be dischargeable in a Chapter 7; and (6) the debtor's motivation and sincerity in seeking Chapter 13 relief.

Id.

17. As this Court has previously noted

> A factor courts look to in determining "good faith" is the type of debt sought to be discharged and whether such debt is nondischargeable in a Chapter 7. Mason v. Young, 237 B.R. 791, 799 (10th Cir. BAP 1999) (an attempt to discharge a debt in a Chapter 13 case that is nondischargeable in a Chapter 7 is not per se bad faith unless combined with other factors that show an overall effort to avoid paying creditors).... [W]hen the debtor seeks the Chapter 13 superdischarge to discharge debt that would remain undischarged in a Chapter 7, [the debtor's] burden is especially heavy" in overcoming an objection to confirmation based on "good faith." In re Virden, 279 B.R. at 407 (citations omitted).

18.  If this case were filed pursuant to Chapter 7, the Debtor would not be entitled to a discharge of the debt owed to Eureka.

19.  The Debtor's original Schedules I and J and a plan which proposed to pay creditors only 1.5% while the Debtor enjoyed a comfortable lifestyle did not reflect the good faith required of a Chapter 13 debtor.  When confronted with this Court's orders sustaining objections to confirmation of the original plan, the Debtor was inexplicably able to nearly double his disposable income.  But close examination of the original and amended Schedule I indicates the Debtor is less than sincere in listing his expenses.  For example, in the original schedule I filed in December 2005, the Debtor lists food costs of $250.  In the amended Schedule I filed in June 2006, the food cost dramatically increased to $750.  The scheduled transportation costs increased from $370 to $600 and more amazingly installment payments for an auto changed from zero to $250 even though amended Schedule B, filed contemporaneously with amended schedule I, still indicates the Debtor owns only a 1999 Ford Expedition with 198,000 miles on it.

20.  The proposed amended plan which will only increase the dividend by 0.1% also misses the mark.  If the Debtor intended to make an honest effort to pay his creditors, he would have undertaken collection of the lease residuals to pay Wentworth's creditors, many of whom are his as well.  Instead he has done nothing.

21.  It is clear that this Debtor is attempting to thwart the collection efforts of Eureka.  The filing of this case comes on the heels of the District Court's grant of an attachment against the Debtor's residence.  The claims of the nine other unsecured

creditors[3] total only $58,529.87 and the Debtor disputes a large portion of those claims. Eureka's claim, with attorneys' fees awarded by the District Court and interest, is in excess of $200,000. It is Eureka's claim which precipitated the filing of this case and which has caused the Debtor to engage in numeric gymnastics present in this case.

22. The petition was not filed in good faith.

23. The plan was not proposed in good faith.

24. The best interests of the creditors will be served by dismissal of this case.

Therefore it is hereby ORDERED that the above case is DISMISSED.

Dated: October 13, 2006

*Joel B. Rosenthal*
Joel B. Rosenthal
United States Bankruptcy Judge

---

[3] One of the undisputed claims is a $5.00 credit card balance that was last used in 2001. Another is a line of credit with a balance of $1,970 also not used since 2001. A third is a credit card with a balance of $2,296 that was last used in 2003. With the exception of these de minimis claims and that of Debtor's employer, whose claim totals $27,582.70, the Debtor disputes all other quantified claims. One creditor is listed as having a claim in an unknown amount. Most of the remaining creditors incurred their claims defending Wentworth in the District Court action or loaning the Debtor the funds needed to avoid possible incarceration for violation of the District Court's order.